MARY M. HESLIN, COMMISSIONER OF CONSUMER
PROTECTION *v.* CONNECTICUT LAW CLINIC
OF TRANTOLO AND TRANTOLO
(10892)

PETERS, PARSKEY, SHEA, SPONZO and SPADA, Js.

---

Argued March 10—decision released June 28, 1983

*David E. Ormstedt,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Robert M. Langer,* assistant attorney general, for the appellant (plaintiff).

*Maxwell Heiman,* with whom, on the brief, was *William J. Tracy, Jr.,* for the appellee (defendant).

PETERS, J. The principal issue in this appeal is whether an investigative demand of Mary M. Heslin, the Connecticut Commissioner of Consumer Protection (commissioner), issued to attorneys suspected of engaging in deceptive trade practices, exceeds the commissioner's statutory authority and unlawfully exercises a power vested by the constitution of Connecticut exclusively with the state judiciary. The case arose when the defendant, Connecticut Law Clinic of Trantolo & Trantolo, refused to comply with an investigative demand issued to it by the plaintiff commissioner pursuant to the Connecticut Unfair Trade Practices Act.

General Statutes §§ 42-110a through 42-110q[1] (CUTPA, the act). Upon the defendant's refusal to comply, the commissioner sought an order requiring compliance from the Superior Court.[2] The trial court, holding the regulation of attorney conduct to be a matter exclusively within the control of the judicial branch of the state government, dismissed the commissioner's application. From this judgment of dismissal, the commissioner has appealed. We find error and remand for further proceedings.

---

[1] General Statutes § 42-110d (c) provides: "(c) In addition to other powers conferred upon the commissioner, said commissioner may execute in writing and cause to be served by certified mail an investigative demand upon any person suspected of using, having used or about to use any method, act or practice declared by section 42-110b to be unlawful or upon any person from whom said commissioner wants assurance that section 42-110b has not, is not or will not be violated. Such investigative demand shall contain a description of the method, act or practice under investigation, provide a reasonable time for compliance, and require such person to furnish under oath or otherwise, as may be specified in said demand, a report in writing setting forth relevant facts or circumstances together with documentary material."

[2] "[General Statutes] Sec. 42-110k. COMMISSIONER'S ENFORCEMENT POWERS. COURT ORDERS. If any person fails or refuses to file any statement or report, or obey any subpoena or investigative demand issued by the commissioner or his authorized representatives, the commissioner may, after notice, apply to the superior court for the judicial district of Hartford-New Britain, which court, after a hearing thereon, may issue an order: (1) Granting injunctive relief to restrain the person from engaging in the advertising or sale of any commodity or the conduct of any trade or commerce that is involved in the alleged or suspected violation; (2) vacating, annulling or suspending the corporate charter of a corporation created by or under the laws of Connecticut or revoking or suspending the certificate of authority to do business in this state of a foreign corporation or revoking or suspending any other licenses, permits or certificates issued pursuant to law to such person which are used to further the allegedly unlawful practice; and (3) granting such other relief as may be required, until the person files the statement of report, or obeys the subpoenas or investigative demand. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof."

The investigative demand in controversy, in accordance with General Statutes § 42-110d (c),[3] provided the defendant with a description of the alleged practices under investigation. These alleged practices included unfair or deceptive use of the terms "clinic" and "law clinic" in the defendant's advertising, misrepresentations by the defendant as to its fees and as to the fees of other attorneys performing the same services, and referrals by the defendant to the law firm of Trantolo & Trantolo, which caused those referred to pay higher legal fees than the fees advertised by the defendant. The commissioner's demand required the defendant to respond to interrogatories and produce documentation concerning: the number of persons employed by the defendant, contracts and fee agreements between the defendant and its clients, fees actually paid to the defendant by its clients, advertisements placed by the defendant, and the defendant's relationship with the law firm of Trantolo & Trantolo.

Under CUTPA, issuance of an investigative demand upon any person must be predicated upon the commissioner's suspicion that the person is using, has used or is "about to use any method, act or practice declared by section 42-110b to be unlawful," or upon the commissioner's wish to obtain assurance from the person "that section 42-110b has not, is not or will not be violated." General Statutes § 42-110d (c). The aforementioned § 42-110b, which is the substantive keystone of the act, provides, in subsection (a): "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." On appeal, the defendant urges us to hold, as did the trial court, that application of § 42-110b (a) to attorney conduct would violate

---

[3] See footnote 1, supra, for full text of General Statutes § 42-110d (c).

the doctrine of separation of powers, and that consequently an investigation into such conduct may not be enforced by the courts.

## I

Preliminarily, it is necessary to consider the commissioner's claim that the trial court acted prematurely by inquiring, in the context of proceedings to enforce an investigative demand, into the commissioner's ultimate authority to regulate attorney conduct. In support of her contention, which was considered and rejected by the trial court, the commissioner relies on our decision in *In re Application of Ajello* v. *Moffie,* 179 Conn. 324, 426 A.2d 295 (1979). In that case, which involved a proceeding initiated by the attorney general to enforce an investigative subpoena based on suspected violations of the Connecticut Anti-Trust Act; General Statutes § 35-42; we held: "While courts which enforce such subpoenas may inquire into most questions of legality, they may not inquire into questions concerning the coverage or even the probable coverage of the statute under which the attorney general is acting." Id., 326.

The holding in *Ajello* was based on our recognition that the legislature, when it endows an administrative body with responsibility for a statute's enforcement, may authorize that body, rather than the trial court, "to determine the question of coverage in the preliminary investigation of possibly existing violations." *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186, 214, 66 S. Ct. 494, 90 L. Ed. 614 (1946); *New Orleans Public Service, Inc.* v. *Brown,* 507 F.2d 160, 165 (5th Cir. 1975). An administrative body so empowered may, by virtue of such authority, develop, without interference or delay, a factual basis for the determination of whether particular activities come

within its regulatory authority. *Securities & Exchange Commission* v. *Brigadoon Scotch Distributing Co.,* 480 F.2d 1047, 1052–53 (2d Cir. 1973). It is presumed that, in authorizing such investigations, the legislature has delegated to the administrative body a power which the legislature lawfully possesses. Where, however, a colorable claim is made that the preliminary investigation is not "within the power of [the legislature] to command"; *Oklahoma Press Publishing Co.* v. *Walling,* supra, 209; that presumption is rebutted. It then becomes necessary and proper for the trial court to determine, before proceeding further, "the authority of [the] administrative agency to act." *Aaron* v. *Conservation Commission,* 178 Conn. 173, 178, 422 A.2d 290 (1979).

We observe in the present case that the defendant's motion to dismiss did not merely dispute the coverage of the Unfair Trade Practices Act, but questioned as well the legislature's constitutional power to regulate attorney conduct. The commissioner concedes that, absent such a power in the legislature, the commissioner had no authority to issue the investigative demand in question. We conclude that in response to the defendant's constitutional claim, the trial court's ruling on the motion to dismiss was not premature. We therefore turn to the merits of that ruling.

## II

Although the trial court, in addressing the constitutional question, assumed that CUTPA applies to the defendant, our inquiry on review must begin with whether the act authorizes the commissioner to regulate attorney conduct. We conclude that it does.

CUTPA was designed by the legislature to "put Connecticut in the forefront of state consumer protection." 16 H. R. Proc., Pt. 14, 1973 Sess., p. 7324 (remarks of

Representative Howard A. Newman). It endows the commissioner with broad powers: to investigate suspected violations of the act; General Statutes § 42-110d (a)-(c); to define, through the promulgation of regulations, what may constitute unfair or deceptive acts or practices; General Statutes § 42-110b (c); and to subpoena witnesses, conduct hearings, and issue cease-and-desist orders to persons determined to have violated the act. General Statutes § 42-110d (d). The commissioner may also seek enforcement of the act in the Superior Court; id.; which is authorized to enjoin violations of the act and to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any practices prohibited by this chapter . . . ." General Statutes § 42-110d (e).[4]

CUTPA contains no language expressly including or excluding attorneys from its purview. Since the defendant does not claim that it falls within one of the act's general exceptions,[5] the question on appeal is whether

---

[4] CUTPA also contains provisions, not directly addressed in the present appeal, creating a private cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." General Statutes § 42-110g (a); see *Hinchliffe* v. *American Motors Corporation*, 184 Conn. 607, 440 A.2d 810 (1981).

[5] "[General Statutes] Sec. 42-110c. EXCEPTIONS. (a) Nothing in this chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States; or (2) acts done by the publisher, owner, agent or employee of a newspaper, periodical or radio or television station in the publication or dissemination of an advertisement, where the publisher, owner, agent or employee did not have knowledge of the false, misleading, unfair or deceptive character of the advertisement, and did not have direct financial interest in the sale or distribution of the advertised product or service.

"(b) The burden of proving exemption, as provided in this section, from the provisions of this chapter shall be upon the person claiming the exemption."

the provision of legal services constitutes "the conduct of any trade or commerce." General Statutes § 42-110b (a). The act defines trade or commerce as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

It is not surprising that CUTPA is textually inconclusive on the question of whether the practice of law is included within the conduct of trade or commerce. In 1973,[6] before lawyers engaged in advertising and when few lawyers were incorporated, existing precedents tended to exclude the work of the legal profession from the category of trade or commerce. See, e.g., *Federal Club* v. *National League,* 259 U.S. 200, 209, 42 S. Ct. 465, 66 L. Ed. 898 (1922); *Rosenthal* v. *State Bar Examining Committee,* 116 Conn. 409, 414, 165 A. 211 (1933). CUTPA antedated, by several years, the seminal case of *Bates* v. *State Bar of Arizona,* 433 U.S. 350, 380–82, 97 S. Ct. 2691, 53 L. Ed. 2d 810 (1977), which held that advertising by lawyers was protected as commercial speech within the ambit of the first amendment. The court there noted that any historical foundation for restraints on advertising has crumbled, "[s]ince the belief that lawyers are somehow 'above' trade has become an anachronism." Id., 371–72. At the same time, it recognized that, in order to cope with the risks of misleading or deceptive advertising, "the vigilance of a regulatory agency will be required." Id., 379.

We need not speculate about the intent of CUTPA's drafters, because the act contains its own guide to

---

[6] The Connecticut Unfair Trade Practices Act, presently codified as General Statutes §§ 42-110a through 42-110q, was passed as Public Acts 1973, No. 73-615.

statutory construction. It provides, in § 42-110b (b): "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner [of consumer protection] and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. [§] 45 (a) (1)),[7] as from time to time amended."

Although the federal courts have not directly addressed the issue of whether the Federal Trade Commission Act (FTC Act) applies to attorneys, the existing decisions provide considerable guidance. The United States Supreme Court has recently affirmed application of the FTC Act to other professionals. *American Medical Assn.* v. *Federal Trade Commission,* 455 U.S. 676, 102 S. Ct. 1744, 71 L. Ed. 2d 546 (1982) (per curiam) (divided court), aff'g. mem., 638 F.2d 443 (2d Cir. 1980).[8] That court, furthermore, has, since the

---

[7] 15 U.S.C. § 45 (a) (1) (1976), provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

[8] While the FTC Act expressly exempts certain classes of persons from its coverage; 15 U.S.C. § 45 (a) (2); attorneys are not among those exempted. 15 U.S.C. § 45 (a) (2) (1981) provides: "The Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a (f) (3) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958 [49 U.S.C. § 1301 et seq.], and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. § 181 et seq.], except as provided in section 406 (b) of said Act [7 U.S.C. § 227 (a)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." In addition, the last session of Congress rejected a proposed amendment to the FTC Act which would have extended the list of exemptions to include state-regulated professionals. S. 2499, 97th Cong., 2d Sess., § 3 (c) (1982). That statute, which was never enacted, would have provided: "(c) Section 5 (a) (2) of the Federal Trade Commission Act (45 U.S.C. [§] 45 (a) (2)) is amended by inserting immediately after 'except' the first time it appears the following: 'practitioners of a profession whose members are licensed and regulated by a State as a condition of independent practice within the State, incorporated or unincorporated associations of State-regulated professionals.' "

passage of CUTPA, decided that the practice of law may constitute the conduct of a trade or commerce under the Sherman Anti-Trust Act, 15 U.S.C. § 1. *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 786–88, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975). Lower federal courts have construed the FTC Act as jurisdictionally in pari materia with the Sherman Act. E.g., *American Cyanamid Co.* v. *Federal Trade Commission,* 363 F.2d 757, 770 (6th Cir. 1966); see also *Island Tobacco Co.* v. *R. J. Reynolds Industries, Inc.,* 513 F. Sup. 726, 737 (D. Hawaii 1981). In light of the above, it is reasonable to conclude that the federal courts would construe the FTC Act as applying to attorneys.

If we look to interpretations of the FTC Act given by the federal trade commission itself, we need exercise fewer cautions. As early as 1964, an attorney who had prepared a dunning letter and had participated in a collection scheme violative of 15 U.S.C. § 45 (a) (1) was held to have himself violated the FTC Act and was enjoined from using threats of legal action in connection with the unlawful scheme. *In re Wilson Chemical Co.,* 64 F.T.C. 168, 186–87, 190 (1964).[9] More recently, the federal trade commission has unequivocally stated its official position that state-regulated professions, including the practice of law, are not and should not be

[9] The federal trade commission's opinion in *In re Wilson Chemical Co.,* stated: "The next issue before us is that raised by the respondent Davis. It is his contention that Section 5 does not apply to him because the collection letter of an attorney is not commerce within the Federal Trade Commission Act. Mr. Davis prepared the wording of the letter which was sent by the company in an attempt to collect cash for the salve. For this service he received, and continues to receive, compensation. Mr. Davis was aware that his letter would be used to dun recipients of the salve. It was to this end that he delegated authority to the company to use the letters in any manner that they felt necessary. Having so participated in the preparation of the letters and their use in the collection scheme of the company, he must be equally as liable as the company for any violation of Section 5 which arises from the letters." *In re Wilson Chemical Co.,* 64 F.T.C. 168, 186–87 (1964).

exempted from coverage of the FTC Act. Reauthorization of the Federal Trade Commission, 1982 Hearings on S. 1984 Before the Senate Comm. on Commerce, Science, and Transportation, 97th Cong., 2d Sess., 32–36 (letter, by direction of the Federal Trade Commission, of James C. Miller III, Chairman).

Federal law thus provides us with strong precedents for concluding that CUTPA applies to attorneys. Such a conclusion is buttressed by the fact that it comports with the decisions of other jurisdictions construing substantially similar legislation. *Reed* v. *Allison & Perrone,* 376 So. 2d 1067, 1068–69 (La. Ct. App. 1979); *DeBakey* v. *Staggs,* 605 S.W.2d 631, 633 (Tex. Civ. App. 1980); see also *Matthews* v. *Berryman,* 637 P.2d 822, 826 (Mont. 1981). It comports as well, obviously, with the enforcing agency's view of the statute, a recognized aid to statutory construction. *Board of Trustees* v. *Freedom of Information Commission,* 181 Conn. 544, 551–52, 436 A.2d 266 (1980); *Connecticut Light & Power Co.* v. *Public Utilities Control Authority,* 176 Conn. 191, 198, 405 A.2d 638 (1978). It comports, finally, with the liberal construction to which a remedial statute such as CUTPA is entitled. *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); see General Statutes § 42-110b (d). As Professor Davis has pointed out, complex new business arrangements inevitably "bring forth equally intricate governmental mechanisms requiring effective exercise of the administrative power of investigation." Davis, Administrative Law Text (3d Ed.) § 3.08, p. 67; see also *Bates* v. *State Bar of Arizona,* supra.

We need not in this case decide whether every provision of CUTPA permits regulation of every aspect of the practice of law by every member of the bar of this state. For now, we need conclude only that

CUTPA's regulation of "the conduct of any trade or commerce" does not totally exclude all conduct of the profession of law. For the purpose of sustaining an investigatory demand, we conclude that CUTPA applies to the conduct of attorneys.

## III

The defendants' final claim is that CUTPA, as applied to attorney conduct, is constitutionally infirm because it would violate the doctrine of separation of powers contained in article second of the Connecticut constitution. That article provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."[10] In its separation of powers argument, the defendant does not dispute that the substantive and procedural scheme of CUTPA, as a means of protecting consumers and prohibiting unfair trade practices, constitutes a proper exercise of the legislature's power to define rights and prescribe remedies; *State* v. *Clemente,* 166 Conn. 501, 509–10, 353 A.2d 723 (1974); *Atwood* v. *Buckingham,* 78 Conn. 423, 428, 62 A. 616 (1905); nor does the defendant claim that the statute has no reasonable relation to the public health, safety and welfare. *State* v. *Darden,* 171 Conn. 677, 680, 372 A.2d 99 (1976); *State* v. *Gordon,* 143 Conn. 698, 703, 125 A.2d 477 (1956). Rather, the defendant reads article second of the state constitution as granting the judiciary exclusive authority to regulate the professional conduct of attorneys, and as

---

[10] Article fifth, § 1 of the Connecticut constitution vests the judicial power of the state "in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish."

thereby prohibiting the regulation of attorneys by means of a legislative enactment such as CUTPA. We disagree.

It is important, at the outset, to recognize that the challenge of any state statute on constitutional grounds imposes a difficult burden on the challenger. We have consistently held that every statute is presumed to be constitutional and have required invalidity to be established beyond a reasonable doubt. *Eielson* v. *Parker,* 179 Conn. 552, 557, 427 A.2d 814 (1980); *State* v. *Olds,* 171 Conn. 395, 411, 370 A.2d 969 (1976); *Adams* v. *Rubinow,* 157 Conn. 150, 152–53, 251 A.2d 49 (1968). In the context of challenges to statutes whose constitutional infirmity is claimed to flow from impermissible intrusion upon the judicial power, we have refused to find constitutional impropriety in a statute "simply because it affects the judicial function, so long as it is an exercise of power assigned by the constitution to the legislature." *Eielson* v. *Parker,* supra, 560; *State* v. *Darden,* supra, 680–81. In many situations, executive, legislative and judicial powers necessarily overlap. In such situations, a statute is not unconstitutional unless "it represents an effort by the legislature to exercise a power which lies exclusively under the control of the courts; *State* v. *Clemente,* 166 Conn. 501, 507, 510–11, 353 A.2d 723 [1974]; *Heiberger* v. *Clark,* 148 Conn. 177, 169 A.2d 652 [1961]; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 140 A.2d 863 [1958]; or if it establishes a significant interference with the orderly conduct of the Superior Court's judicial functions. *Adams* v. *Rubinow,* [157 Conn. 150, 160–61, 251 A.2d 49 (1968)]." *State* v. *Darden,* supra, 679. In the present appeal, the defendant has claimed, and the trial court has held, that the

statute in question governs subject matter that is not only within the judicial power but is vested exclusively within judicial control.[11]

We agree with the defendant that he has established the first part of the constitutional test. As applied to attorneys, CUTPA unquestionably deals with subject matter that is within the judicial power. The Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar. See *State* v. *Jones,* 180 Conn. 443, 448, 429 A.2d 936 (1980); *Lublin* v. *Brown,* 168 Conn. 212, 228, 362 A.2d 769 (1975); *Heiberger* v. *Clark,* supra, 182–83; *Grievance Committee of the Bar of New Haven County* v. *Sinn,* 128 Conn. 419, 422, 23 A.2d 516 (1941); *In re Kone,* 90 Conn. 440, 442, 97 A. 307 (1916); *In re Durant,* 80 Conn. 140, 147, 67 A. 497 (1907). The judiciary has the power to admit attorneys to practice and to disbar them; *In re Application of Griffiths,* 162 Conn. 249, 252, 294 A.2d 281 (1972), rev'd on other grounds, 413 U.S. 717, 93 S. Ct. 2851, 37 L. Ed. 2d 910 (1973); *Heiberger* v. *Clark,* supra, 185–86; *In re Durant,* supra; to fix the qualifications of those to be admitted; *In re Application of Griffiths,* supra; *Heiberger* v. *Clark,* supra; and to define what constitutes the practice of law. *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 232. In the exercise of its disciplinary power, the Superior Court has adopted the Code of Professional Responsibility. Practice Book, pp. 1-52 (as amended 1982). Since attorney advertising, referrals by attorneys to other legal practitioners, and fee arrangements between attorneys and clients are regulated by the disciplinary rules of the code; see, e.g., DR 2-101[12] (advertising);

---

[11] Neither in the trial court nor in this court has the defendant maintained that CUTPA interferes with the orderly functioning of the Superior Court.

[12] Code of Professional Responsibility, DR 2-101 (A) provides: "A lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use, or participate in the use of, any form

DR 2-103[13] (referrals); DR 2-106[14] (fees); enforcement of the code may provide sanctions for wrongful practices which also violate CUTPA.

We are, however, unpersuaded that the defendant has proven that CUTPA unconstitutionally operates in an area under the exclusive control of the courts. That CUTPA, a statute of general applicability, may overlap with disciplinary rules specific to attorney conduct does not render the statute unconstitutional. See *Lublin* v. *Brown,* supra, 228. It is no derogation of the judiciary's power over attorneys to recognize that such power is not, in every respect, an exclusive one. Comparison of the judicial disciplinary system with CUTPA discloses their disparate functions.

It is their unique position as officers and commissioners of the court; *In re Application of Griffiths,* supra, 255; *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* supra, 234; which casts attorneys in a special relationship with the judiciary and subjects them to its discipline. Disciplinary proceedings are for the purpose of preserving the courts "from the official ministration of persons unfit to practise in them." *Ex Parte Wall,* 107 U.S. 265, 288, 2 S. Ct. 569, 27 L. Ed. 552 (1883); *Heiberger* v. *Clark,* supra, 183; *Grievance Committee* v. *Broder,* 112 Conn. 263, 265, 152 A. 292 (1930); *In re Peck,* 88 Conn. 447, 452, 91 A. 274 (1914). Such proceedings do not concern themselves with the rights of

of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim, nor shall any such communication be in an extravagant format."

[13] Code of Professional Responsibility, DR 2-103 (A) provides: "A lawyer shall not, except as authorized in DR 2-101 (B), recommend employment, as a private practitioner, of himself, his partner, or associate to a layperson who has not sought his advice regarding employment of a lawyer."

[14] Code of Professional Responsibility, DR 2-106 (A) provides: "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee."

parties as between themselves. *In re Durant,* supra, 149. Indeed there are no adversary parties in the technical legal sense.[15] *Heiberger* v. *Clark,* supra, 182. Thus the judiciary's disciplinary machinery contains no mechanism for recompensing those who are the victims of attorney misconduct. See *Grievance Committee of the Bar of New Haven County* v. *Sinn,* 128 Conn. 419, 423, 23 A.2d 516 (1941).

We should not permit the special relationship of attorneys to the judiciary to blind us to the fundamental importance of the relationship of attorneys to their clients. Although the canons of ethics and the disciplinary rules of the Code of Professional Responsibility purport to govern both the official and the private aspects of the practice of law, the code's emphasis is consistently ethical and regulatory. CUTPA, by contrast, is primarily addressed to the pragmatic concerns of the public; it emphasizes prevention of injury to the consumer of legal services and redress to those injured by attorney misconduct. See General Statutes § 42-110d (e); see also Steele & Nimmer, "Lawyers, Clients and Professional Regulation." American Bar Foundation Research J. 917, 923 (1970).

---

[15] The disciplinary power of the judiciary branch may be exercised by a summary order of suspension or disbarment by the Superior Court, if the attorney misconduct occurs in the presence of the court. Practice Book §§ 29 through 30; see *In re Durant,* 80 Conn. 140, 147, 67 A. 497 (1907). To reach misconduct occurring outside the presence of the court, the disciplinary power has been delegated to some extent to local grievance committees. Practice Book §§ 27B, 31. These local committees are composed of members of the Connecticut bar appointed by the judges of the Superior Court. Each local committee may, inter alia, "(1) On its own motion or on complaint of any person, inquire into and investigate offenses not occurring in the actual presence of the court involving the character, integrity, professional standing and conduct of members of the bar in this state. (2) In its discretion, dismiss a complaint with or without a hearing; after a hearing reprimand an attorney complained against or present him to the superior court for reprimand, suspension for a period of time or disbarment." Practice Book § 27B (b).

CUTPA in no way relieves attorneys of the ethical duties imposed on them by the code.[16] For the conduct that CUTPA declares illegal, it provides distinctly separate remedies, different both in purpose and in form from the scheme of regulation envisaged by the code. We recognize that CUTPA's distinct form and purpose do not, by themselves, guarantee that the judiciary's disciplinary power will continue to operate in an unhindered fashion. The defendant has not, however, demonstrated the contrary. A priori, there is no reason why the code and CUTPA cannot coexist.[17]

---

[16] At oral argument, the defendant stated that an attorney investigated by the commissioner of consumer protection could be faced with the dilemma of whether to disclose client confidences in compliance with the commissioner's investigative demand, in violation of the Code of Professional Responsibility, DR 4-101 (B) (1). While we recognize the potential for such a problem, we reject the implication that the Superior Court, in imposing the ethical duty of confidentiality, intended to provide lawyers with immunity from litigation in which that duty might be tested. Nothing in the Unfair Trade Practices Act prevents an attorney from refusing to provide information protected, under the laws of evidence, by the attorney-client privilege. We also note that the ethical burden on investigated attorneys is alleviated by DR 4-101 (C) (4), which permits an attorney to disclose "[c]onfidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct." See *Meyerhofer* v. *Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1194-95 (2d Cir. 1974).

[17] This principle, that distinct governmental entities may exercise concurrent jurisdiction over a particular field of activity, has been developed in those decisions of the United States Supreme Court addressing the sometimes uneasy interaction of federal and state commercial regulation. E.g., *Askew* v. *American Waterways Operators, Inc.*, 411 U.S. 325, 329-37, 93 S. Ct. 1590, 36 L. Ed. 2d 280, reh. denied, 412 U.S. 933, 93 S. Ct. 2746, 37 L. Ed. 2d 162 (1973); *Amalgamated Assn. of Street, Electric Railway & Motor Coach Employees of America* v. *Lockridge*, 403 U.S. 274, 285-97, 91 S. Ct. 1909, 29 L. Ed. 2d 473, reh. denied, 404 U.S. 874, 92 S. Ct. 24, 30 L. Ed. 2d 120 (1971); *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 141-46, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963). The court has explained: "The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that

The present case is a facial attack on the constitutionality of a statute which has a sphere of operation that need never intrude upon the exclusive province of the judiciary to control the conduct of attorneys as officers of the court. We cannot, of course, exclude the possibility that, at some time in the future, a more difficult confrontation will have to be resolved.[18] Judicial restraint counsels us to await that event. For today, we need only hold that the application of the commissioner to pursue her inquiry into the alleged misconduct of this defendant was authorized by CUTPA and that CUTPA, in the present circumstances, is not unconstitutional.

---

the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc.* v. *Paul,* supra, 142. Thus state regulations which operate in a context regulated by the federal government are not offensive under the supremacy clause so long as "both regulations can be enforced without impairing the federal superintendence of the field . . . ." Id.; *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 337, 269 A.2d 276 (1970); *State* v. *Anonymous (1980-8),* 36 Conn. Sup. 551, 556, 421 A.2d 867 (1980); see Tribe, American Constitutional Law (1978) § 6-25.

[18] The defendant claims that one aspect of the Unfair Trade Practices Act impinges directly on the judiciary's power to disbar attorneys. General Statutes § 42-110k provides: "COMMISSIONER'S ENFORCEMENT POWERS. COURT ORDERS. If any person fails or refuses to file any statement or report, or obey any subpoena or investigative demand issued by the commissioner or his authorized representatives, the commissioner may, after notice, apply to the superior court for the judicial district of Hartford-New Britain, which court, after a hearing thereon, may issue an order . . . revoking or suspending any other licenses, permits or certificates issued pursuant to law to such person which are used to further the allegedly unlawful practice . . . ."

We do not opine as to the constitutionality of using this provision to revoke an attorney's license to practice law. We observe only (1) that it is not at issue in the present case, and (2) that it is not so mutually dependent on or connected to the rest of the statute as to suggest a legislative intent that the provision be unseverable. See *Seals* v. *Hickey,* 186 Conn. 337, 353-54, 441 A.2d 604 (1982); *Collins* v. *York,* 159 Conn. 150, 158, 267 A.2d 668 (1970).

There is error, the judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion SHEA, SPONZO and SPADA, Js., concurred.

PARSKEY, J. (concurring). I agree that the legal profession may, under certain circumstances, be subject to the Connecticut Unfair Trade Practices Act; General Statutes §§ 42-110a through 42-110q; and that in these circumstances the act is constitutional. I also agree that the defendant by its activity was engaged in a trade or commerce within the meaning of § 42-110a (4) and that therefore it was subject to investigation by the plaintiff for alleged violations of the act. I do not construe the court's opinion as saying more than this. Other problems are reserved for another day. See *Goldfarb* v. *Virginia State Bar,* 421 U.S. 773, 788n, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975).